**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

AUGIE DURANTE and
PABLITA DURANTE,

        Plaintiffs,

00 SEP 22 PM 4: 13

vs.

        No. CIV 99-1179 RLP/DJS

AMERICAN STATES INSURANCE COMPANY,

        Defendant.

## MEMORANDUM IN SUPPORT OF
## MOTION IN LIMINE TO EXCLUDE PLAINTIFFS' EXPERT
## OR FOR A *DAUBERT* HEARING

### INTRODUCTION

This case involves the issue of whether the Plaintiffs[1] are entitled to coverage under a

commercial property insurance policy issued by Defendant American States Insurance Company

The Plaintiffs contend that certain damage to their truck service building in Gallup, New Mexico,

was caused in 1995 by blasting at an open pit gravel quarry 3/4 mile south of the property in

question. Defendant hired an engineering firm, AGRA Earth & Environmental ("AGRA") to

investigate the claim in 1995, and denied coverage on the basis that the investigation determined

the damage to be a non-covered cause, namely collapse of the earth under the building because of

moisture-sensitive soils.

    There was good reason for that conclusion. During discovery in this cause, Defendant has

uncovered evidence that Plaintiffs filed a lawsuit in 1996 against a neighboring landowner, John

---

[1] The Defendant has pending a Motion to Require Joinder of Party Plaintiff, seeking to
have the named insured under the applicable insurance policy, namely Augie's Truck Service,
Inc., substituted for the individual Plaintiffs as party plaintiffs in this cause.



DeArmond, and the City of Gallup because of drainage and flooding problems at both their mobile home park and truck service property that abut the DeArmond property. The evidence shows that in 1992 the Plaintiffs were complaining about flooding and drainage problems at the truck service shop and resulting damage to the truck shop's foundation. They hired an engineer, who concluded that the culverts along the front of the property were flooding onto the truck service property and that there was ponding of water that was causing settlement around the building.

Plaintiffs settled that drainage/flooding case, and now claim damages to the truck service building was caused by blasting.

In support of their blasting claim, the Plaintiffs have employed Gary T. Carlisle, a purported "expert" who is clearly unqualified to express an opinion about ultimate issues in this case.

Mr. Carlisle, a Gallup resident, was hired personally by the Plaintiff, Augie Durante. Mr. Carlisle has no previous relevant experience as an expert witness and has no experience, education or training that qualified him to be an expert in this case. Mr. Carlisle arrived at his opinion in this case strictly by a visual inspection of the property. He first opined that the damage to the building "could have" been caused by blasting. He changed his opinion to a "possibility" after consulting with Plaintiffs' counsel, Pete V. Domenici, Jr. There was absolutely no basis to change the opinion from a mere hunch to a 75% "possibility." No treatises were consulted, no tests were performed, no standards used, and no scientific methodology was employed. Neither the initial opinion nor the revised opinion meet the standard needed to for the Plaintiffs to carry their burden to prevail in this case. See, *Chronister v. State Farm Mut. Auto. Ins. Co.*, 72 N.M. 159, 163, 381

P.2d 434 (1963). See also, *Curtis v. State Farm Mut. Auto. Ins. Co.*, 591 F.2d 572 (10th Cir. 1979).

## STATEMENT OF UNDISPUTED MATERIAL FACTS OF RECORD

### Facts Regarding Expertise and Testimony of Gary T. Carlisle

1.      Plaintiff Augie Durante retained Gary Carlisle, who prepared an initial written report, based on a visual inspection. He opined that the damage to the Plaintiffs' property "could have" been caused by blasting. Mr. Carlisle then changed his written report after consulting with Plaintiffs' counsel. The only change between the initial report and the final report was the conclusion that there was a "75% possibility" that blasting was the cause of the damage to the Durante property. Deposition of Gary Thomas Carlisle, pp. 69-70, 75, 78, 81-82; Depo. Ex. 1, attached hereto as Exhibit "A."

2.      Mr. Carlisle's original opinion and his change of opinion were not based upon review of any professional manuals or handbooks, nor were they the result of any calculations or testing. *Id.*, pp. 78-79.

3.      Mr. Carlisle was not provided with any information about the Plaintiffs' previous lawsuit, nor did he review any of the evidence in the prior suit about damage at the truck service building being due to drainage and flooding problems. *Id.*, pp. 66-67.

4.      Mr. Carlisle has never previously done a presentation to be used as evidence (*Id.*); he has never appeared as an expert witness (*Id.*, p. 53); and the only time he appeared as a witness was as a military policeman and sometimes in connection with military courts-martial (*Id.*, p. 5); he has never previously consulted on blasting effects. *Id.*, p. 44.

5.      Mr. Carlisle received a Bachelor of Science in mining engineering in 1967 from the

-3-

South Dakota School or Mining & Technology (*Id.*, p. 6), and he has no post graduate degree (*Id.*, p. 7).

6.     In college, Mr. Carlisle took only a one-semester course in blasting (*Id.*, p. 7); the mining curriculum, which has changed radically in 35 years, did not include ground vibration measurement. *Id.*, pp. 40-41, 98.

7.     Mr. Carlisle has never taken a course on blast damage assessment (*Id.*, pp. 41-42), nor has he studied the forensics of blasting.  *Id.*, p. 7.  In connection with course work to maintain his professional license during the last ten years, Mr. Carlisle has not taken any courses related to blasting damage, nor soil assessment.  *Id.*, p. 60.  The most recent licensure course he took was in 1997 on the topic of pressure vessels.  *Id.*, p. 56.

8.     Mr. Carlisle is presently retired (*Id.*, p. 25), but his occupations are a business called Carlisle Boiler Inspection Service (*Id.*), and consulting about the mechanization of hospitals, which is his primary focus.  *Id.*, p. 61-62, 65-66.

9.     Mr. Carlisle has supervised underground uranium miners at various sites (*Id.*, pp. 13-14, 16, 19), but all of those jobs entailed underground blasting and did not involve any evaluation of surface vibration damage to buildings.  *Id.*, pp. 48-50.  He has no expertise in the design of coal mine (open pit) blast criteria.  *Id.*, p. 97.

10.     Mr. Carlisle's only teaching experience was at the University of New Mexico, Gallup Branch, in 1982, where he taught heating and air conditioning and construction technology, but he has never taught blast vibration damage assessment (*Id.*, pp. 22-23, 41-42, 51, 66), nor has he taught any course, published any materials nor given a presentation of any kind on blast vibration effects within the past ten years.  *Id.*, pp. 93-95.  Mr. Carlisle has not taught a

course on soil assessment in the past ten years. *Id.*, p. 60.

11.     Mr. Carlisle presently is not a member of any professional organizations (*Id.*, p. 27); he was a member of the American Institute of Mining, Metallurgical, and Petroleum Engineers (AIME) only when he was a student between 1976 and 1982. *Id.*

12.     Mr. Carlisle has never done any seismic investigations or testing *(Id.*), and his only previous "evaluation" of blasting damage was during a summer job while in college at the South Dakota State Cement Plant Quarry (6/65-9/65). *Id.*, pp. 29-31. During that evaluation, his involvement was "mainly politics," which he described as "looking at damages and assuring people that the company would fix their homes." *Id.*, pp. 36. His evaluation was solely visual examination; he did not write any reports, did not conduct any seismic testing, did not consult with any engineers, and did not perform any scaled distance measurements of the blasts. *Id.*, pp. 35, 37-38, 45.

13.     A layman's "felt effects" from a blast are not a scientific method of blast measurement (*Id.*, p. 37), and being able to feel blast effects in the air has no bearing on whether a blast can cause vibration damage to a structure. *Id.*, pp. 83, 141.

14.     With respect to his evaluation of the property in question, Mr. Carlisle did not consult any professional texts, professional manuals or handbooks (*Id.*, pp. 66-67, 78); did not conduct any tests or calculations (*Id.*, pp. 78-79, 100); did not consult with any experts in blast vibration evaluation (*Id.*, p. 67); and conducted no research other than an Internet search to determine regulation of blasting in response to a request by Plaintiffs' counsel because he had no knowledge about licensure requirements for blasters; however, he did not review those materials. *Id.*, pp. 77-78, 95-96, 145-146.

15.    Mr. Carlisle's opinion was based solely upon a visual inspection of the property in question (*Id.*, pp. 66, 100), visual examination of a sheet of building plans (*Id.*, p. 131), examination of Defendant's 1995 AGRA's Report and discussions with Plaintiff Augie Durante (*Id.*, pp. 66-67), and visual examination of damage to other structures in the area. *Id.*, p. 84.

16.    Mr. Carlisle understands the value of specialized scientific calculations and testing because he utilizes such techniques in other endeavors, namely in his boiler inspection business (*Id.*, p. 50-51), and in conducting shelving load calculations (*Id.*, p. 52), although he conducted no specialized tests to verify his hypothesis in this case.  See ¶¶ 14 and 15 above.

17.    Mr. Carlisle's "supposition" (*Id.*, p. 102) involved analysis of similar damage to other structures, which he described as a "common sense" approach: "If it's happening one place, it might be happening other places."  *Id.*, p. 84.

18.    Mr. Carlisle's supposition further holds that "if it's blasting damage, it should be in a circular area around the mine" (*Id.*, pp. 85, 102); that concrete cracks in properties around the quarry would be "concentric with the quarry" (*Id.*, Carlisle Depo. Ex. 1, ¶ 6) — meaning the cracks are parallel to each other with respect to the mine (*Id.*, p. 128; Carlisle Depo. Ex. 14) — i.e.: "That the forces from the blast would travel outward similar to the ripples from dropping a rock in a pond, that they would be concentric."  *Id.*, pp. 103, 150.

19.    In arriving at and applying his supposition, Mr. Carlisle:

A.    Conducted visual examinations of other structures looking for "similar" cracks in floors and foundations "being tangential to the direction of the mine."  (*Id.*, p. 101);

B.    Did a visual examination of the cracks at the property in question (*Id.*, p.

-6-

129);

C.   Did a visual examination of structures around the quarry identified in his
report, but he conducted no testing, no seismographic readings, no soils
studies, and no distance measurements *(Id.,* pp. 114-115, 121-122, 123);

D.   Never studied the geology in the area, or consult with geologists, or read
geological reports (other than hydrology reports about an area 40 miles
away) *(Id.,* pp. 85-86);

E.   Had no knowledge of actual charge weights, actual delay intervals, actual
peak particle velocities at Twin Buttes Quarry, nor did he know the type of
actual blasting agent, or frequencies of the actual blasts *(Id.,* pp. 90-91);

F.   Had no prior experience with blast vibration effects (except for summer job
in college), so felt "it was a common sense thing to do, to go around and
look and see if there was damage to other things and if they were oriented
parallel to the direction of the mine." *(Id.,* pp. 98);   and

G.   Used no instruments to measure direction of cracks, and performed no
tests to determine how blast waves would have propagated *(Id.,* pp. 128-
129).

20.   Mr. Carlisle has no experience in soils engineering or geology, other than one
college course in geology, which did not deal with blast vibration effects. *Id.,* pp. 97-98.  He is
not aware of what a soils expert does, nor what equipment is employed, but admits a geological
engineer would have some expertise in blast vibration effects. *Id.,* pp. 94-95.

21.   Mr. Carlisle's hypothesis is not derived from anyone else; it is "strictly mine." *Id.,*

pp. 102, 129. He hasn't read of the hypothesis anywhere, nor had a blast vibration expert explain the hypothesis, nor learned it in any of his courses at the South Dakota School of Mines (Id., pp. 103), nor derived the hypothesis from any technical manuals. Id., pp. 119.

22.     Mr. Carlisle admitted that where he examined the concrete border of a cemetery plot, his photos show cracks around **all** sides of the border, and that rather than cracks being in a "concentric" circle in parallel around the mine they, in fact, also run perpendicular to the quarry. Id., pp. 110-112, Depo. Exs. 3, 4 and 15.

23.     Mr. Carlisle also based his opinion on the blasts being too heavy because of the size of rock "spoils," but he could not say these rocks were, in fact, a by-product of blasting rather than having been dug out. Id., p. 106.

24.     Even though he had read the Defendant's 1995 AGRA Report (Id., pp. 66-67), Mr. Carlisle conducted no tests or other examination at any location to rule out possible causes other than blasting (Id., p. 122), he states that the cause of the damage to the Plaintiffs' building is settling of the slab and foundation. Id., pp. 142, 146-147.

25.     Mr. Carlisle has no knowledge of what constitutes safe levels of ground vibration for concrete slabs and steel structures of the type at the property in question (Id., p. 146); he could not identify the tests that typically would be used by someone evaluating the strength of blasts or their effects on buildings (Id., p. 140); and he does not know the factors that are involved in evaluating effects of blasts on structures, and he has no knowledge of the thresholds for blast damage to buildings. Id. He testified that he was not familiar with "scaled distance measurement" of blast effects. Id., p. 38.

26.     Mr. Carlisle has no knowledge of any mining experts who use his hypothesis or

methods of blast damage assessment. *Id.*, p. 147.

27.    Mr. Carlisle has no knowledge that his hypothesis or methods have ever been tested before. *Id.*, p. 148.

28.    Mr. Carlisle has no knowledge that his hypothesis or methods have been the subject of peer review or publication. *Id.*, p. 148-149.

29.    Mr. Carlisle has no knowledge that his hypothesis or methods have any known or potential rate of error. *Id.*, p. 149.

30.    Mr. Carlisle has no knowledge that his hypothesis or methods have any standards governing their application. *Id.*, p. 149.

31.    Mr. Carlisle has no knowledge that his hypothesis or methods have ever been accepted in any treatise or textbook. *Id.*, pp.149-150.

32.    In 1975, Bob Booth, as an employee of Sergent, Hauskins & Beckwith, Geotechnical Engineers, performed a detailed evaluation of stress damage to the Union 76 Truck Stop property (now the Texaco Service Station) east of the Plaintiffs' truck shop, and determined that the cracking foundation there was a result of collapsing soils. (See, Affidavit of Robert D. Booth, ¶ 21, filed concurrently herewith.). Mr. Booth was the lead engineer for Defendant's engineering firm, AGRA, in the evaluation of the damage to Plaintiffs' truck service building.

33.    The Union 76 Truck Stop was among the neighboring properties identified through visual inspection by Plaintiffs' expert, Mr. Carlisle, as having suffered blasting damage. (See, Exhibit "A," Carlisle Depo., Ex. 1.)

34.    Mr. Carlisle was found by Plaintiff Augie Durante, who presented him to Plaintiffs' counsel who, in turn, advised Mr. Durante that Mr. Carlisle's "credentials were satisfactory."

(See, Exhibit "B," Augie Durante deposition, pp. 165-167, Augie Durante Depo. Ex. 22.)

### General Facts

32.    The Plaintiffs had an insurance policy purchased from Defendant American Insurance Company ("ASI") number 04-CD-148316, with the effective dates of January 18, 1995 through January 18, 1996. Complaint, ¶ 5.

33.    The Plaintiffs' commercial building was covered by the policy of insurance. Complaint, ¶ 7.

34.    The Plaintiffs' claim that they are entitled to coverage under the policy because their truck shop building sustained damage in 1995 from blasting. Complaint, ¶¶ 7 and 15.  The Plaintiffs' date of loss was identified by ASI as being June 1, 1995.  See Plaintiffs' Response to Motion to Dismiss, Exhibit 4.  Docket #25.  The loss was attributed by the Plaintiffs to blasting at the Twin Buttes quarry.  See Plaintiffs' Response to Motion to Dismiss, Exhibit 2.

35.    Defendant hired the firm of AGRA Earth & Environmental to conducted an investigation in 1995 to determine the cause of the damage to the Plaintiffs' property.  Affidavit of Robert D. Booth, ¶ 5.

36.    The AGRA investigation determined that the cause of the damage to the Plaintiffs' property was settlement of moisture-sensitive soils under the building which were causing the foundation to collapse.  See, Affidavit of Robert D. Booth, ¶ 9.

37.    Damage due to earth movement or sinking of the earth is excluded under the insurance policy.  See Exhibit "A" attached to Defendant's Motion to Dismiss, Docket #23 (Causes of Loss-Special Form).

38.    There is extensive evidence of a history of drainage and flooding problems on the

-10-

property in question, which evidence supports the 1995 AGRA conclusions including the following:

A.   In 1992, Plaintiffs retained an engineer, John P. Haynes, to investigate drainage problems at their truck shop property, who determined that culverts that run along the north side of the truck shop property are too narrow to handle water runoff, which leads to flooding; and that the septic system problems and poor drainage for the truck service building causes ponding and *settlement*. (See Exhibit "B," Augie Durante Depo. Ex. 27.)

B.   Because the culverts in front of the truck shop property are not large enough to hold the volume of water that flows from the culverts from the east, and because they are not kept clean, they overflow, which causes flooding at the truck shop property. (See Exhibit "B," Augie Durante Depo, pp. 203-206, 207-208, 232-234, 237-238, 240; Augie Durante Depo. Exs. 27 and 28; Deposition of Pablita Durante, attached hereto as Exhibit "C," p. 16.)

C.   The flooding problems at the truck shop property were creating visible signs of damage to the foundation of the truck shop as early as 1992, the same area now claimed to be damaged by blasting vibrations. (See, Exhibit "B," Augie Durante Depo, p. 217; Augie Durante Depo. Ex. 28).

D.   Plaintiffs filed a lawsuit in 1996 styled *Durante v. City of Gallup, et al.*, Cause No. CV-158-II in the Eleventh Judicial District Court, County of McKinley, State of New Mexico, and sought damages as a result of

-11-

flooding to an adjacent property, but included evidence of flooding on the subject property in this case. The relief Plaintiffs sought included a requirement that the City of Gallup fill in a low spot on a dirt road along the western boundary of the property in question where water had been ponding. (Deposition of Augie Durante, attached hereto as Exhibit "B," pp. 210-211; Augie Durante Depo. Ex. 30, ¶ 8.)

E. Plaintiffs settled the suit in 1997, collected $20,000 and released their neighboring property owner, John DeArmond. *Id.*

## ARGUMENT

**1. Gary T. Carlisle is Not Qualified to Render Any of the Opinions He Tenders Under the Standards of *Daubert* and *Kumho*.**

Faced with a proffer of expert scientific testimony, the Court must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993). These requirements apply to all proffered expert testimony, including that of engineers, and not just testimony based on novel scientific methods or evidence. *Id.*, at 593 n.11; *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137 (1999).

*Daubert* requires a trial judge to determine whether the expert's testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." *Kumho*, 526 U.S. at 149.

-12-

The non-exclusive tests established in *Daubert* and *Kumho* ask: (1) whether a theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether in respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community. *Id.*, at 149-150.

In addition, courts both before and after *Daubert* have found other factors relevant in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact. These factors include: (1) whether an expert is proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying, *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995); and (2) whether the expert has adequately accounted for obvious alternative explanations. *Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994).

Clearly, the *Daubert* criteria should be used to eliminate "junk science" of the sort being propounded by the Plaintiffs' expert in the case at bar. See Bruce D. Black, The Use (or Abuse) of Expert Witnesses in Post-*Daubert* Employment Litigation, 17 Hofstra University School of Law 2 (Spring 2000); *Wilson v. City of Chicago*, 6 F.3d 1233, 1238 (7th Cir. 1993). Applying the *Daubert* criteria to the testimony of Plaintiffs' expert leads to the inevitable conclusion that his testimony is unreliable and he cannot assist the trier of fact in making any determination relevant to the issues in this lawsuit.   Not only does Plaintiffs' proposed expert, Gary T. Carlisle, lack the knowledge, skill, experience, training, or education to qualify him to express an opinion in this case, but his methods and hypothesis fit the facts of *Kumho* to a "T."  In *Kumho*, the Supreme

-13-

Court held that the *Daubert* factors apply to the testimony of engineers and other experts who are not scientists, and excluded the plaintiff's expert as being unreliable.

In applying the *Daubert* factors, the *Kumho* Court noted that the district court had excluded the testimony of the Plaintiff's expert "because, despite [his] qualifications, it initially doubted, and then found unreliable, 'the methodology employed by the expert in analyzing the data obtained in **the visual inspection**, and the scientific basis, if any, for such an analysis.'" 523 U.S. at 153 (Emphasis in bold added). The Court went on: "For one thing, and contrary to respondents' suggestion, the specific issue before the court was not the reasonableness *in general* of a tire expert's use of a **visual and tactile inspection** to determine whether over-deflection had caused the tire's tread to separate from its steel-belted carcass. Rather, it was the reasonableness of using such an approach, along with Carlson's particular method of analyzing the data thereby obtained, to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant*. That matter concerned the likelihood that a defect in the tire at issue caused its tread to separate from its carcass." 523 U.S. 153-154 (Emphasis in bold added).

The Court, in short, placed great emphasis upon the unreliability of the expert's subjective "visual and tactile" methods and the "subjectiveness of his mode of analysis." *Id.* at 155. The Court stated that it could find no indication that other experts in the industry used the expert's particular theory, nor, despite the prevalence of tire testing, was there any reference to any articles or papers that validated his approach. *Id.* at 157.

### A.   Plaintiffs' Putative Expert Lacks the Knowledge, Skill, Experience, Training, or Education to Qualify Him to Express an Expert Opinion.

To qualify under Rule 702, a putative expert must have such knowledge, skill, experience,

training, or education (the witness must be "expert"), and the "expert's" testimony must assist the trier of fact. An individual who does not have such knowledge, skill, experience, training or education cannot aid the trier of fact. *City of Hobbs v. Hartford Fire Ins. Co.*, 162 F.3d 576, 586 (10th Cir. 1998). Mr. Carlisle does not have sufficient knowledge, skill, experience, training or education to qualify as an expert, nor can he assist the trier of fact in this case.

Mr. Carlisle has testified that he has no knowledge of what safe levels of ground vibration would be for concrete slabs and steel structures of the type at the property in question *(Id.,* p. 146); he could not identify the tests that typically would be used on someone evaluating the strength of blasts or their effects on buildings *(Id.,* p. 140); he does not know the factors that are involved in evaluating effects of blasts on structures; and he has no knowledge of the thresholds for blast damage to buildings *(Id.).* He has never used scaled distance measurements, which are a basic alternate method to seismic monitoring of measuring vibration thresholds. *Id.,* p 38.

Mr. Carlisle further testified he has never examined blast vibration effects (except for summer job in college where he did "politics" for the company). He testified he felt simply that "it was a common sense thing to do, to go around and look and see if there was damage to other things and if they were oriented parallel to the direction of the mine " *(Id.,* pp. 98).

Most striking was Mr. Carlisle's complete lack of preparatory research for his evaluation. When asked what he studied in preparation for his evaluation of damage at Augie's Truck Service, Mr. Carlisle testified: "Nothing in particular. I talked to Augie. I talk [sic] to surrounding businesses and visual observation." *Id.,* p. 66.

Under such circumstances, the Court is justified in concluding that Mr. Carlisle fails to meet the threshold requirement of Rule 702 to qualify him as an "expert" so as to render an

opinion in this case. *Broadcort Capital Corp. v. Summa Medical Corp.*, 972 F.2d 1183 (10th Cir. 1992).

**B.    Plaintiffs' Putative Expert's Hypothesis and Methods Fail to Meet Any Indicia of Reliability.**

    **1.    Mr. Carlisle's Hypothesis Has Neither Been Tested Nor Been Subjected to Peer Review, Nor Does It Have Any Known or Potential Rate of Error; There Are no Standards Controlling the Technique's Operation, Nor Has the Hypothesis Been Generally Accepted Within the Relevant Scientific Community.**

Pursuant to *Daubert*, an expert's hypothesis and methods must meet basic indicias of reliability. Neither Mr. Carlisle's hypothesis nor his methodology meet the *Daubert* standards of reliability.

Mr. Carlisle himself admits that he has no knowledge of any mining experts who use his hypothesis about blast damage assessment. Carlisle Depo., p. 147. He also admits that he has no knowledge that his hypothesis or methods have ever been tested before. *Id.*, p. 148. Mr. Carlisle has no knowledge that his hypothesis or methods have been the subject of peer review or publication *(Id.*, p. 148-149), nor that they have any known or potential rate of error. *Id.*, p. 149. Mr. Carlisle testified that he has no knowledge that his hypothesis or methods have any standards governing their application *(Id.*, p. 149), and that he has no knowledge that his hypothesis or methods have ever been accepted in any treatise or textbook. *Id.*, pp. 149-150.

As with the unreliable expert in *Kuhmo*, Mr. Carlisle testified that he applied his theory strictly through visual inspection, and he performed no supportive testing, examination, calculations or analysis to verify the theory. He testified that he conducted entirely visual examinations of the property in question *(Id.*, pp. 66, 100, 129), and of other structures looking

for "similar" cracks in floors and foundations *(Id.*, p. 101); that he conducted exclusively visual examinations of structures around the quarry identified in his report *(Id.*, p. 123, 129); and that he conducted no testing, no seismographic readings, no soils studies, and no distance measurements *(Id.*, pp. 114-115, 121, 122, 123).

Moreover, Mr. Carlisle admits that he lacks any knowledge of the technical aspects of measuring and evaluating the vibration effects of blasting upon structures. See Statement of Undisputed Material Facts of Record, ¶¶ 6, 7, 9, 10, 12, 20 and 25.

### 2.    Mr. Carlisle's Theory Does Not Grow Naturally Out of Independent Research But Was Developed Solely For Purposes of Litigation.

An expert's opinion must have been developed out of independent research and must not have been developed solely for purposes of litigation. *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995). In this case, Mr. Carlisle's ultimate opinions were developed solely for litigation and exclusively by consulting with Plaintiffs and their counsel.

Clearly, the opinions of Mr. Carlisle were generated for this litigation and have no independent scientific basis. In Augie Durante's Deposition, he testified that he found Mr. Carlisle, and that he presented him to Plaintiffs' counsel, who, in turn, advised Mr. Durante that Mr. Carlisle's "credentials were satisfactory." (See, Exhibit "B," Augie Durante Depo., pp. 165-167, Depo. Ex. 22.) However, Mr. Carlisle's credentials were hardly appropriate to qualify him as an expert in blast vibration damage. For example, Mr. Carlisle had no familiarity with the most fundamental principles involved in evaluating vibration damage to structures from blasting. Mr. Carlisle has no knowledge of what constitutes safe levels of ground vibration for concrete slabs and steel structures of the type at the property in question (Carlisle Depo., p. 146); he could not

-17-

identify the tests that typically would be used on someone evaluating the strength of blasts or their effects on buildings (*Id.*, p. 140); and he does not know the factors that are involved in evaluating effects of blasts on structures, and he has no knowledge of the thresholds for blast damage to buildings *(Id.)*.

Mr. Carlisle prepared an initial written report that concluded the damage to the Plaintiffs' property "could have" been caused by blasting. The report was altered after he spoke with Plaintiffs' counsel, and he then concluded there was a "75% possibility" that blasting was the cause. Deposition of Gary T. Carlisle, pp. 78, 81-82; Carlisle Depo. Ex. 1. Mr. Carlisle testified that he changed his opinion only because Plaintiffs' counsel "asked me specifically what percentage of certainty I had by saying could have, and I replied at that time on the phone, 75%, and that's what I put in my report." *Id.*, p. 78. He did not review any literature, conduct any tests, consult any treatises, considered no standards, and relied on no scientific methodology to arrive at that percentage of probability. *Id.*, pp. 78-79.

Mr. Carlisle's testified his hypothesis was not derived from anyone else; it is "strictly mine." *Id.*, pp. 102, 129. He hasn't read of the theory anywhere, nor had a blast vibration expert explain the theory, nor learned it in his in any course at the South Dakota School of Mines *(Id.*, pp. 103), nor derived the theory from any technical manuals. *Id.*, pp. 119.

He testified that he did not consult any professional texts, professional manuals or handbooks (*Id.*, pp. 66-67, 78), did not conduct any tests or calculations (*Id.*, pp. 78-79, 100), did not consult with any experts in blast vibration evaluation (*Id.*, p. 67), and conducted no research other than an Internet search to find the regulations regarding blasting. He obtained the regulations only because Plaintiffs' counsel asked him to do so and he had no previous knowledge

about licensure requirements for blasters. *Id.*, pp. 95-96, 146.[2]

### 3. Mr. Carlisle Has Failed to Adequately Account for Alternative Explanations.

An expert must have accounted for alternative explanations for a specific cause. *Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994). In this case, Mr. Carlisle has failed to do so even when the evidence of alternative causes was contained in the Defendant's 1995 AGRA Report. Moreover, the issue of flooding and drainage problems on the property was known to Plaintiffs, but that information was withheld from Mr. Carlisle.

Mr. Carlisle utilizes and understands the value of scientific calculations and testing in other endeavors, namely in his boiler inspection business (*Id.*, p. 50), and in conducting shelving load calculations. *Id.*, p. 52. He testified that he had read the Defendant's 1995 AGRA Report. *Id.*, pp. 66-67. However, Mr. Carlisle conducted no tests or other examination at any location to rule out possible causes other than blasting, such as poor soils (*Id.*, p. 122), though he states that the cause of the damage to the Plaintiffs' building is settling of the slab and foundation. *Id.*, pp. 142, 146-147.

Even if he had thought about conducting such tests, he admitted he was not qualified to do so. Mr. Carlisle testified that he has no experience in soils engineering or geology, other than one college course in geology and then did not deal with blast vibration effects. *Id.*, pp. 97-98. He is not aware of what a soils expert does, nor what equipment is employed, but admits a geological engineer would have some expertise in blast vibration effects. *Id.*, pp. 94-95.

Most striking in this regard is Mr. Carlisle's testimony: **"I don't think the damage is a**

---

[2] It is interesting to note that Mr. Carlisle makes no claim that any regulations were violated, or that any of the regulations he found--but did not review--even apply.

**direct result of the blasting.  The damage is a direct result of settling of the slab."** *Id.*, p.

146.  He stated that "sinking ground" was also the direct cause of damage to the concrete border

at the cemetery plot he looked at.  *Id.*, p. 112.

Mr. Carlisle makes this conclusion with absolutely no expertise in soils assessment or

geology.  *Id.*, pp. 94-95, 97-98.  Thus, even if the blasts were of such magnitude to create

vibrations strong enough to damage structures 3/4 of a mile distant (a fact thoroughly analyzed

and refuted by the AGRA Report), Mr. Carlisle lacks any basis other than guesswork to draw any

logical and scientific conclusions from such an hypothesis.

Mr. Carlisle's failure to account for alternative possible causes is rendered all the more

egregious because of the evidence of prior flooding and drainage problems on the property in

question.  In 1992, Plaintiffs were complaining about flooding problems at the truck service

property, which they state were damaging the foundation of the truck shop building.  Augie

Durante Depo, p. 217; Depo. Ex. 28.They hired an engineer to evaluate the problem, who

identified poor site drainage, flooding from adjacent culverts and septic tanks that were causing

*settlement.*  (See, Exhibit "B," Augie Durante Depo., Depo Ex. 27.)

These flooding/drainage problems support the 1995 AGRA study, which provides further

evidence of both the inept quality of Mr. Carlisle's investigation, and the duplicative nature of the

Plaintiffs' claims in this case.  Moreover, one of the properties selected by Mr. Carlisle as proof

that blasting was affecting neighboring properties, the Texaco service station, was evaluated for

distress damage by Defendant's expert,  Robert D. Booth, *in 1975.*  He concluded that the

distress damage to that building was to result of poor soils.

The evidence of drainage problems, flooding and poor soils overwhelms the fundamentally

flawed work of Mr. Carlisle. Not only had Defendant's expert previously concluded that of one

of Mr. Carlisle's supposed blast-damaged sites suffered damage from poor soils, but Mr. Carlisle

himself had to admit his hypothesis was inherently contradictory with respect to the cemetery plot

### C.   The Court May Determine Whether Plaintiffs' Expert is Qualified and Reliable on the Pleadings.

The admissibility of testimony by an expert witness under Federal Rule of Evidence 702 is

governed by the standards set forth in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)

and *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). It is within the

discretion of the trial court to determine how to perform its gate-keeping function under *Daubert*.

*Goebel v. Denver and Rio Grande Western Railroad Co.*, 215 F.3d 1083 (10th Cir. 2000), citing

*Kumho*.

The most common method of fulfilling this function is a *Daubert* hearing, although such a

process is not specifically mandated, and the Court may satisfy its gatekeeper role when asked to

rule on a motion in limine. *Id.* While the Court has discretion in the manner in which it conducts

its *Daubert* analysis, the Court may adopt specific findings of fact based on the record. *Id.*

### D.   The Plaintiffs May Not Seek Leave to Obtain Another Expert.

The deadline for disclosure of Plaintiffs' expert witness reports in this case pursuant to the

Court's Initial Pretrial Report was March 8, 2000. The discovery deadline is August 11, 2000. It

is too late for the Plaintiffs to attempt to designate another expert. *Weisgram v. Marley*, __ U.S.

__; 120 S. Ct. 1011; 2000 U.S. LEXIS 1011, 145 L. Ed. 2d 958; 68 U.S.L.W. 4122 (2000). As

stated in *Weisgram:* "Since *Daubert*, moreover, parties relying on expert evidence have notice of

the exacting standards of reliability such evidence must meet. It is implausible to suggest, post-

*Daubert,* that parties initially present less than their best expert evidence in the expectation of a second chance should their first try fail." 120 S. Ct. at 1021.

In light of *Weisgram,* the Court should consider the imposition of sanctions, including an award of Defendant's attorney's fees, costs, expert witness fees, and other expenses against the Plaintiffs and their counsel.

## CONCLUSION

For foregoing reasons, the Court should issue its Order excluding the Plaintiffs' putative expert, Gary Thomas Carlisle, and awarding Defendant its reasonable attorneys fees, costs, expert witness fees and related expenses.

Respectfully submitted,

DINES, GROSS & ESQUIVEL, P.C.

By: _William D. Winter_

William D. Winter
Attorneys for Defendant American States Insurance
6301 Indian School Road, Suite 900
Albuquerque, NM 87110
(505) 889-4050

I HEREBY CERTIFY that a copy of the foregoing was hand delivered on this *10th* day of August, 2000, to:

Pete V. Domenici Jr. Esq.
Priscilla L. M. Garcia, Esq.
DOLAN & DOMENICI, P.C.
6100 Seagull NE, Suite 205
Albuquerque, NM 87109

William D. Winter, Esq.

F:\SAFECO Durante\Pleadings\Daubert.Memo.wpd

-22-

THE EXHIBITS ATTACHED TO THIS

PLEADING ARE TOO VOLUMINOUS TO

SCAN.  SAID EXHIBITS ARE ATTACHED

TO THE ORIGINAL PLEADING IN THE

CASE FILE WHICH IS LOCATED IN THE

RECORDS DEPARTMENT,  U.S.

DISTRICT COURT CLERK'S OFFICE.